**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
Pamela E. Prescott, Esq. (SBN: 328243)
pamela@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

**KAZEROUNI LAW GROUP, APC**
Jason A. Ibey, Esq. (SBN: 284607)
jason@kazlg.com
321 N Mall Drive, Suite R108
St. George, Utah 84790
Telephone: 800-400-6808
Facsimile: 800-520-5523

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**DIANE M. CLARK AND JAMES M. CLARK, Individually and On Behalf of All Others Similarly Situated,**

Plaintiffs,

v.

**WELLS FARGO & COMPANY; and WELLS FARGO BANK, N.A.,**

Defendants.

**Case No.:** 3:21-cv-09422

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**

1) **UNFAIR COMPETITION LAW ("UCL"), CAL. BUS. & PROF. §§ 17200, *ET SEQ.*;**

2) **BREACH OF CONTRACT;**

3) **UNJUST ENRICHMENT**

**JURY TRIAL DEMANDED**

**INTRODUCTION**

1.     Plaintiffs DIANE M. CLARK ("Ms. Clark") and JAMES M. CLARK ("Mr. Clark") (together the "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action to prevent the unlawful conduct of defendants WELLS FARGO & COMPANY and WELLS FARGO BANK, N.A. (together the "Defendants" or "Wells Fargo"), resulting in violations of: (1) California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq*., and for (2) breach of contract; and (3) unjust enrichment.

2.     Wells Fargo provides, among other things, mortgage services throughout the United States, including in the State of California.

3.     As part of its mortgage servicing operations, Wells Fargo collects the monthly mortgage payments of borrowers (like Plaintiffs and the putative class members), and those funds are, in turn, applied to principal and interest, taxes and insurance as well as any other fees and charges that may have been assessed.

4.     Wells Fargo earns revenue from mortgage loan servicing in several ways. For instance, Wells Fargo earns money from the interest rate it charges when lending out money associated with the home mortgages it provides to borrowers in its function as a home mortgage lender.

5.     Following the worldwide outbreak of COVID-19, Congress passed the Coronavirus Aid, Relief and Economic Security ("CARES") Act in order to, among many other things, provide some relief to millions of American homeowners struggling to make their mortgage payments as a result of the economic difficulties caused by the pandemic.

6.     The CARES Act instructed mortgagees and servicers to create mortgage forbearance provisions for all federally-backed mortgages, which includes loans serviced by Defendants. As a result, many Wells Fargo customers elected to participate in the CARES Act in order to defer their mortgage payments through a forbearance.

7.   However, as the COVID-19 financial crisis has improved, many borrowers are able to transition back to full payments on their home mortgages. And, borrowers who did not apply for the CARES Act may want to take advantage of better interest rates by refinancing with Defendants through a loan modification.

8.   Under the CARES Act, "[a] partial claim loan is a zero interest, no fee, junior lien on [the] mortgage property that will become payable when [one] sells [the] home, pay[s] off [the] mortgage or [the] mortgage otherwise terminates".[1]

9.   As described herein, Wells Fargo prayed on vulnerable borrowers by engaging in a "bait-and-switch" scheme to get borrowers to accept loan modification terms that were less favorable to the consumer, whether less favorable than a partial claim loan under the CARES Act or under the guise that an initial loan modification offer from Wells Fargo had an incorrect interest rate.

10.   Plaintiffs allege the following based upon personal knowledge as to herself and her own acts, and on information and belief as to all other matters, including, the investigation conducted by and through her attorneys which includes, without limitation, a review of Defendant's public documents, announcements, and wire and press releases published by and regarding Defendants, and information readily obtainable on the internet.

## JURISDICTION AND VENUE

11.   Jurisdiction if proper under 28 U.S.C. § 1332(d) ("CAFA"), which provides for original jurisdiction of the federal courts of any class action in which any member of the class is a citizen of a state different from the defendant, and in which the matter in controversy exceed, in the aggregate, the sum of $5,000,000, exclusive of interest and costs.

12.   Upon information and belief, many members of the proposed Classes are residents of states other than California.

---

[1] www.hud.gov/sites/dfiles/SFH/documents/IACOVID19FBFactSheetConsumer.pdf

KAZEROUNI
LAW GROUP, APC

13.     Upon information and belief, the total claims of individual members in this action are in excess of $5,000,000, where Plaintiffs seek attorneys' fees, punitive damages, specific performance of a loan modification agreement and other forms of equitable relief, which, when aggregated among the proposed class in the several thousands, exceeds the $5,000,000 threshold.

14.     Both diversity jurisdiction and the damages requirement under CAFA are satisfied, and this Court therefore has subject matter jurisdiction.

15.     Upon information and belief, Wells Fargo & Company is a Delaware corporation headquartered in San Francisco, California.

16.     Defendant Wells Fargo Bank, N.A. is a national association that is headquartered in South Dakota.

17.     Plaintiffs alleges that at all times relevant herein, Defendants conducted business in the State of California, and within this judicial district.

18.     This Court has personal jurisdiction over Defendant Wells Fargo & Company, which has its principal place of business in San Francisco, California and is authorized to do business in California, transacts business in California and maintains sufficient minimum contacts in California.[2]

19.     This Court has personal jurisdiction over Defendant Wells Fargo Bank, N.A., because it is authorized to do business in California, transacts business in California and maintains sufficient minimum contacts in California.

20.     Venue is proper in the United States District Court for the Northern District of California pursuant to 18 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred within this judicial district and the

---

[2] In *Fitch v. Wells Fargo Bank, N.A. et al.*, No. 2:08-cv-01639-NJB-DEK (E.D. LA May 15, 2012), Defendants admitted that "Wells Fargo maintains its principal place of business" in the "Northern District of California" (*id*. at n. 12), and that such district was a forum where that class action could have been originally brought (*id*. at p. 8).

KAZEROUNI LAW GROUP, APC

Defendants conduct substantial business within this judicial district.

**PARTIES**

21.     At all times relevant, Plaintiffs each were and are an individual residing in the State of California, County of Orange.

22.     Plaintiffs jointly own a home located in Buena Park, California that is mortgaged through Wells Fargo.

23.     Defendant Wells Fargo & Company provides various financial services including home mortgages, banking, insurance, investments and other products and services to consumers, businesses and other institutions.

24.     Defendant Wells Fargo & Company is reported to have approximately $1.9 trillion in assets.[3]

25.     Defendant Wells Fargo & Company is the parent corporation of Defendant Wells Fargo Bank, N.A.

26.     Defendant Wells Fargo Bank, N.A. is a national association that is headquartered in South Dakota.

27.     Plaintiffs' mortgage is currently serviced by Defendant Wells Fargo Bank, N.A.

**FACTUAL ALLEGATIONS**

**I.     The CARES Act is Passed in Response to the Financial Hardships Created by the COVID-19 Pandemic**

28.     On March 11, 2020, the World Health Organization ("WHO") declared

---

[3]     *See* Wells Fargo Today, June 2021, https://www08.wellsfargomedia.com/assets/pdf/about/corporate/wells-fargo-today.pdf ("Wells Fargo & Company (NYSE: WFC) is a leading financial services company that has approximately $1.9 trillion in assets, proudly serves one in three U.S. households and more than 10% of small businesses in the U.S., and is the leading middle market banking provider in the U.S. We provide a diversified set of banking, investment, and mortgage products and services, as well as consumer and commercial finance.").

the COVID-19 outbreak a global pandemic.

29.     On March 13, 2020, the President issued the Coronavirus Disease 2019 (COVID-19) Emergency Declaration, which declared that the COVID-19 pandemic was of "sufficient severity and magnitude to warrant an emergency declaration for all states, territories and the District of Columbia."

30.     The economic fallout from COVID-19 was immediate and impacted many Americans.

31.     On March 25, 2020, in response to the economic damage beginning to be felt by Americans throughout the country, the United States Senate passed the Coronavirus Aid, Relief and Economic Security ("CARES") Act. The CARES Act was passed by the House of Representatives the following day and signed into law on March 27, 2020. *See generally* CARES Act, Public Law No. 116-136.

32.     The CARES Act is the single-largest economic stimulus bill in United States' history, allocating approximately $2.2 trillion of support to individuals and business affected by the COVID-19 pandemic.

33.     A substantial part of the coronavirus aid package was designed to assist American homeowners with federally backed mortgages who were in distress as a result of the COVID-19 pandemic.

34.     Part of the CARES Act permits borrowers to put their mortgage in forbearance with the assistance of their mortgage servicer.

35.     A forbearance, as noted by the Consumer Financial Protection Bureau, is "when your mortgage servicer or lender allows you to pause or reduce your mortgage payments for a limited time while you build back your finances."[4]

---

[4] *See* Consumer Financial Protection Bureau, *Learn about forbearance*, https://www.consumerfinance.gov/coronavirus/mortgage-and-housing-assistance/help-for-homeowners/learn-about-forbearance/ (last visited November 23, 2021).

CLASS ACTION COMPLAINT

36.     A forbearance obtained through the CARES Act is not indefinite, however. The forbearance period typically expires at no later than 12 to 18 months from the initiation of the deferment or reduction of mortgage payments.[5]

37.     Many borrowers obtained relief through the CARES Act in 2020, resulting in an influx of mortgage loans that are at the end of their forbearance period within the same time frame.

38.     Indeed, "there are an estimated 1.6 million homeowners currently in various phases of forbearance, and that number continues to fall as more people exit forbearance."[6]

39.     Since a forbearance is not a loan forgiveness, many consumers have to coordinate their forbearance termination strategy with their mortgage servicers.

40.     Consumers generally have several options to exit a forbearance, depending on their servicers and the terms of their forbearance, including: (1) making a full repayment in a lump sum; (2) making intermittent payments; (3) lengthening the term of their loan; (4) deferring repayment until the home is sold, refinanced, or the loan term expires; (5) obtaining a loan modification; and (6) securing a partial claim loan.[7]

41.     Wells Fargo notes to consumers exiting a forbearance that "[a]t the end of the forbearance period, the payment amounts that were suspended or reduced during

_____

[5] *Id.*

[6]   Forbes,   https://www.forbes.com/advisor/mortgages/what-happens-after-mortgage-forbearance-lifts/ ("The largest decrease in a month in the share of loans in forbearance came from a jump in forbearance exits, as many homeowners are nearing the end of their forbearance terms.") (last visited November 23, 2021).

[7] Mortgage Reports, Mortgage forbearance end dates and extension options (2021), (October 2, 2021), https://themortgagereports.com/69687/cares-act-mortgage-forbearance-ending-what-to-do#dates.

the forbearance period accrue and may be added to your mortgage amount."[8]

42.    Wells Fargo further assures consumers that they will "work with you and review your financial situation to see if you're able to repay the forbearance amount, or if a long-term option like a loan modification is available to you."

43.    Despite these assurances, upon information and belief, Wells Fargo does not in fact work with its customers to rightfully figure out a reasonable forbearance exit strategy.

44.     Instead, Wells Fargo strategically engages in a bait and switch scheme in an effort to get consumers who have forbearances that are about to expire into less favorable loan terms.

45.    Specifically, Wells Fargo entices consumers to enter into loan modifications with initial proposals bearing low interest rates and preferable terms, only to turn around and refuse to honor the original loan modification once the consumer's forbearance period has expired, or knowingly failing to process the loan modification in a timely manner for economic gain.

46.    Without any other options, Consumers are then forced to agree to Wells Fargo's subsequent offers containing less favorable terms than what they were originally promised.

47.    This is another opportunistic tactic by Wells Fargo to obtain results that benefit it financially without any regard for the desires or needs of its customers, at the direct expense of consumers.

## II.    Factual Allegations Specific to Named Plaintiffs

48.    Sometime in or around the year 2009, Plaintiffs purchased a home in Buena Park, California with a 30-year fixed mortgage through Wells Fargo, with loan

---

[8] Wells Fargo, Forbearance Plan, *Getting through a temporary hardship*, https://www.wellsfargo.com/mortgage/manage-account/payment-help/forbearance-plan/ (last visited November 23, 2021).

number XXXX872203.[9]

49.     Wells Fargo collects payments and performs mortgage services for Plaintiffs, the borrowers.

50.     Prior to the COVID-19 pandemic, Plaintiffs ensured that their mortgage payments to Wells Fargo were timely, and Plaintiffs maintained good credit.

51.     As a result of the COVID-19 pandemic sweeping the nation and causing significant financial strain and lay-offs, Mr. Clark, a Senior Producer with Walt Disney Imagineering for more than 20 years, was unfortunately one of many Americans that lost employment as a result of the pandemic. Ms. Clark also lost her job as a high school science teacher when the school eliminated her full-time teaching position in light of the pandemic.

52.     In an effort to preserve their financial resources, Plaintiffs elected to participate in the CARES Act, and were able to obtain a forbearance on their mortgage with Wells Fargo delaying about $49,000 worth of payments on their residential mortgage.

53.     Plaintiffs were fortunate that their financial situation improved during 2021, and in the summer of that year, Plaintiffs began preparing to transition back to full payments on their mortgage.

54.     Plaintiffs' forbearance with Wells Fargo obtained through the CARES Act was scheduled to expire on September 30, 2021.

55.     In the months leading up to September of 2021, Plaintiffs began inquiring about their options upon ending the forbearance.

56.     In response to their inquiry, Wells Fargo sent Plaintiffs a letter dated August 18, 2021 stating, "Your payment suspension is ending – we can't extend it. We need to hear from you so we can discuss next steps."

---

[9] The first four digits of the loan number have been redacted for reasons or privacy.

57.    That August 18, 2021 letter also indicated that Plaintiffs would need to resume their regular payments beginning in October of 2021, and that they should contact Wells Fargo before the end of September 2021 to discuss the next steps.

58.    Wells Fargo provided Plaintiffs with several options to exit their forbearance.

59.    One option listed by Wells Fargo in its August 18, 2021 letter advised Plaintiffs that if they did not qualify for the Covid-19 Advance Loan Modification, they could make their regular payments, and Wells Fargo could move the amount past due from the forbearance into a "separate, interest-free loan, called the Federal Housing Administration (FHA) COVID-19 National Emergency Partial Claim" ("Partial Claim Loan").

60.    Plaintiffs called Wells Fargo in early September 2021 regarding the Partial Claim Loan in which Wells Fargo indicated that this option would put the approximate $49,000 worth of deferred payments under the CARES Act forbearance into a separate 0% interest loan as described in Wells Fargo's August 18, 2021 letter.

61.    After considering Wells Fargo's proposals, Plaintiffs decided to apply for a Partial Claim Loan with Wells Fargo that was set to expire September 30, 2021.

62.    Instead of receiving the Partial Claim Loan that was requested by Plaintiff, Wells Fargo sent Plaintiffs a Loan Modification Offer via a written correspondence dated September 9, 2021. This Loan Modification Offer was a much better offer than their current 30-year fixed mortgage and the Partial Claim Loan they considered applying for upon the expiration of their forbearance.

63.    Plaintiffs received this written September 9, 2021 Loan Modification Offer around September 15, 2021.

64.    Plaintiffs called Wells Fargo about this Loan Modification Offer, and Wells Fargo assured them it was a valid offer and that it was sent to borrowers as an option to help them get current on their mortgages because the FHA was prioritizing home preservation.

65.     And Wells Fargo represents online that loan modification documentation will be processed promptly and within 30 days, by stating that "it may take *up to 30 days* to process your application."[10]

66.     Eager to take advantage of this financial opportunity, Plaintiffs decided to take Wells Fargo up on their offer and proceed with the Loan Modification Offer, instead of the Partial Claim Loan.

67.     The September 9, 2021 Loan Modification Offer indicated to Plaintiffs that Wells Fargo was "pleased to let [them] know that [they were] approved for the Advance Loan Modification" and that the FHA, the insurer of their loan, created this program to help consumers exiting forbearances and to get current on their loans.

68.     Wells Fargo further represented that this Loan Modification Offer would bring Plaintiffs mortgage current and make their regular payments more affordable by modifying their loan terms.

69.     Wells Fargo indicated that this Loan Modification Offer was set to expire on October 9, 2021, and that Plaintiffs should submit a signed, notarized copy of the enclosed Loan Modification Agreement by that date to claim the loan.

70.     The Loan Modification Agreement indicated that Plaintiffs first payment was due October 1, 2021, and that the new maturity date was September 2, 2051. The new terms of the loan were represented as follows:

- New principal balance: $335,627.87

- New principal and interest monthly payment amount: $932.30

- Escrowed real estate taxes monthly amount: $437.58

- Escrowed property insurance monthly amount: $93.08

- Total monthly escrow payment: $530.66

- Total modified monthly payment: $1,462.96

---

[10]     https://www.wellsfargo.com/mortgage/manage-account/payment-help/process (emphasis added).

71.     The Loan Modification Agreement also indicated that the new interest rate was 0.0000%.

72.     Relying on Wells Fargo's representations regarding this September 9, 2021 Loan Modification Offer, Plaintiffs timely executed the Loan Modification Agreement, got it notarized, and sent it to Wells Fargo on September 30, 2021 (the day their forbearance plan and Partial Claim Loan expired).

73.     Plaintiffs confirmed through the tracking information that Wells Fargo received the executed Loan Modification Agreement on October 4, 2021 at 9:23 a.m.; five days before it was set to expire as indicated on paperwork from Wells Fargo.

74.     Plaintiffs also confirmed with Wells Fargo over the phone that Wells Fargo received the Loan Modification Agreement on October 4, 2021.

75.     That very same day, Plaintiffs received a second Loan Modification Offer from Wells Fargo dated October 1, 2021, with less favorable terms than the initial Loan Modification Offer that Plaintiffs received on September 15, 2021, subsequently signed and timely returned to Wells Fargo.

76.     Notably, the terms of the second Loan Modification Offer (compared to the initial Loan Modification Offer) increased: (a) the new principal balance from $335,627.87 to $337,421.94; (b) the new principal and interest monthly payment amount from $932.30 to $1,399.94; (c) the total modified monthly payment from $1,462.96 to $1,930.60; and (d) the new interest rate from 0.0000% to 2.8750%

77.     Wells Fargo requested that Plaintiffs sign and agree to this second Loan Modification Offer by October 31, 2021.

78.     Plaintiffs were shocked and confused as to why Wells Fargo sent them this second Loan Modification Offer when they already signed and agreed to the first Loan Modification Agreement, receipt of which Wells Fargo had acknowledged.

79.     Plaintiffs were panicked about this discrepancy because their forbearance expired September 30, 2021 along with the Partial Claim Loan they previously were interested in.

80.     Frustrated and concerned about how to remedy this situation, Ms. Clark called Wells Fargo after receiving this second Loan Modification Offer.

81.     The Wells Fargo representative told Ms. Clark that an "investor" (whom she believes to be FHA) changed the terms of the loan, resulting in Wells Fargo sending out this second, far less attractive, Loan Modification Offer.

82.     Plaintiffs were faced with essentially accepting this second Loan Modification Offer with materially worse terms for Plaintiffs, or pushing their deferred mortgage payments to the end of their current loan term.

83.     In an abundance of caution, Plaintiffs paid their original monthly mortgage payment amount ($2,744.31) to Wells Fargo on October 4, 2021. The payment was applied by Wells Fargo that same day as indicated on Plaintiff's online bank statement.

84.     On October 18, 2021, Wells Fargo sent a third Loan Modification Offer to Plaintiffs dated October 14, 2021, that again, had materially worse terms compared to the initial Loan Modification Offer Plaintiffs received on September 15, 2021.

85.     This third Loan Modification Offer (compared to the first Loan Modification Offer received on September 15, 2021), increased: (a) the new principal and interest monthly payment amount from $932.30 to $1,388.81; (b) the total modified monthly payment from $1,462.96 to $1,926.31; and (c) the new interest rate from 0.0000% to 2.8750%.

86.     The deadline for this third Loan Modification Offer was November 14, 2021.

87.     On October 19, 2021, Ms. Clark called Wells Fargo again to see if Wells Fargo intended on honoring the first Loan Modification Offer in which Wells Fargo already had the signed Loan Modification Agreement. The representative told Ms. Clark that the initial Loan Modification Offer (the one which had been accepted by Plaintiffs, notarized, and timely received by Wells Fargo on October 4, 2021) was not going to be processed.

88. On November 1, 2021, Plaintiffs made another mortgage payment for their original monthly mortgage payment amount of $2,744.31, as Wells Fargo has not processed the loan modification. However, Wells Fargo subsequently notified that this payment has been placed in an "unapplied fund" account.

89. On or about November 20, 2021, Ms. Clark called Wells Fargo to inquire about the status of their mortgage and ask why their November mortgage payment is being held in "unapplied funds."

90. On or about December 1, 2021, Plaintiffs made another timely mortgage payment for their original monthly mortgage payment amount of $2,744.31, as Wells Fargo had not processed the loan modification.

91. In a letter dated November 23, 2021, and received by Plaintiff's on or about December 2, 2021, Wells Fargo informed Plaintiffs that they would be responding to Plaintiffs' complaint concerning the November mortgage payment being placed in an unapplied fund account.

92. Unfortunately, to date, Wells Fargo has not honored the initial Loan Modification Offer that was accepted by Plaintiffs and timely returned to Wells Fargo, despite numerous inquiries from Plaintiffs regarding the status of that loan modification.

93. Upon information and belief, Wells Fargo does not intend to process the loan modification based on the accepted initial Loan Modification Offer.

94. Had Plaintiff been aware that Wells Fargo would refuse to honor its first Loan Modification Offer, they would have made arrangements to pursue the Partial Claim Loan they previously requested. Now, however, the deadline has passed to obtain a Partial Claim Loan under the CARES Act.

95. Due to Defendant's conduct, Plaintiffs have been harmed economically by, at a minimum, having paid attorneys' fees out of pocket to secure legal advice concerning this matter, and through having to pay a higher monthly mortgage amount for the months of October, November and December of 2021.

**CLASS ACTION ALLEGATIONS**

96.     Plaintiffs brings this action on behalf of Plaintiffs and all others similarly situated (the "National Class" and "California Sub-Class").

97.     Plaintiffs represent, and are a member of, the National Class, pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), which is defined as follows:

> All persons in the United States with a residential mortgage loan serviced by Defendants who timely accepted a loan modification offer made by Defendants, concerning the residential mortgage that Defendant/s subsequently did not process and/or honor within 30 days of receipt of the completed loan modification documentation, within the four years prior to the filing of the Complaint in this action.

98.     Plaintiffs represent, and are a member of, the California Sub-Class, pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), which is defined as follows:

> All persons in California with a residential mortgage loan serviced by Defendants who timely accepted a loan modification offer made by Defendant/s, concerning the residential mortgage that Defendants subsequently did not process and/or honor within 30 days of receipt of the completed loan modification documentation, within the four years prior to the filing of the Complaint in this action.

99.     The National Class and California Sub-Class are jointly referred to as the "Classes."

100.    Excluded from the Classes are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein.

101.   Plaintiffs reserve the right to redefine the Classes, including but not limited to expanding the class definition and adding one or more subclasses as appropriate based on discovery and specific theories of liability.

102.   The Class that Plaintiffs seek to represent contains numerous members and is clearly ascertainable including, without limitation, by using Defendants' records to determine the size of the Classes and to determine the identities of individual members of the Classes.

**Numerosity**

103.   The members of the Classes are so numerous that joinder of all members would be unfeasible and impractical. The membership of the Class and California Sub-Class is currently unknown to Plaintiffs at this time. However, on information and belief, the class is likely to consist of several thousands, if not tens of thousands of members. Members of the Classes can easily be identified through Defendants' records. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

**Commonality**

104.   There are questions of law and fact common to the Classes that predominate over any questions affecting only individual members of the Classes. Those common questions of law and fact include, without limitation, the following:

    a) Whether Defendants breached their contracts with Plaintiffs and members of the Classes;

    b) Whether Plaintiffs and the members of the Classes are entitled to specific performance of their loan modifications on their residential mortgage;

    c) Whether Defendants' conduct constituted an unfair business practice;

    d) Whether Defendants' conduct constituted an unlawful business practice;

    e) Whether Defendant's conduct, practices, and misrepresentations

related to the marketing, advertising, and sales of hotel reservations and tickets for their goods and services were unfair, deceptive, confusing, misleading, and/or unlawful in any respect, thereby violating the UCL and other applicable state law;

f) Whether Plaintiff and the member of the Classes were damaged economically by Defendant's conduct;

g) Whether Defendants were unjustly enriched; and

h) Whether members of the Classes are entitled to any such further relief as the Court deems appropriate.

**Typicality**

105. Plaintiffs are qualified to, and will, fairly and adequately protect the interests of each member of the Classes with whom they are similarly situated, and Plaintiffs' claims (or defenses, if any) are typical of all members of the Classes as demonstrated herein.

106. Plaintiffs represent and are members of the Classes because Defendants offered Plaintiffs a Loan Modification and then refused to honor its terms, even after several months of Defendants' receipt of timely executed loan documentation. Consequently, the claims of Plaintiffs are typical of the claims of members of the Classes and Plaintiffs' interests are consistent with and not antagonistic to those of the other members of the Classes whom Plaintiffs seek to represent.

107. Plaintiffs and all members of the Classes have been impacted by, and face continuing harm arising out of, Defendants' violations or misconduct as alleged herein.

**Adequacy**

108. Plaintiffs are qualified to, and will, fairly and adequately protect the interests of each Class member with whom Plaintiffs are similarly situated, as demonstrated herein.

109. Plaintiffs acknowledge that Plaintiffs have an obligation to make known

to the Court any relationship, conflicts, or differences with any member of the Classes.

110.   Plaintiffs' attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement. In addition, the proposed class counsel is experienced in handling claims involving consumer actions and violations of the causes of action asserted. Plaintiffs have incurred, and throughout the duration of this action, will continue to incur costs and attorneys' fees that have been, are, and will be, necessarily expended for the prosecution of this action for the substantial benefit of each member of the Classes.

111.   Neither Plaintiffs nor Plaintiffs' counsel have any interests adverse to those of the other members of the Classes.

**Predominance**

112.   Questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members of the class. The elements of the legal claims brought by Plaintiffs and members of the Classes are capable of proof at trial through evidence that is common to the class rather than individual to its members.

**Superiority**

113.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable and questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes.  Even if every individual member of the Classes could afford individual litigation, the court system could not.  It would be unduly burdensome to the courts if individual litigation of the numerous cases were to be required.

114.   Individualized litigation also would present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual

issues.  By contrast, conducting this action as a class action will present fewer management difficulties, conserve the resources of the parties and the court system, and protect the rights of each member of the Classes.  Further, it will prevent the very real harm that would be suffered by numerous members of the Classes who will be unable to enforce individual claims of this size on their own, and by Defendants' competitors, who will be placed at a competitive disadvantage because they chose to obey the law.  Plaintiffs anticipate no difficulty in the management of this case as a class action.

115.   The prosecution of separate actions by individual members of the Classes may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not party to those adjudications, or that would otherwise substantially impair or impede the ability of those non-party members of the Classes to protect their interests.

116.   The prosecution of individual actions by members of the Classes would establish inconsistent standards of conduct for Defendants.

117.   Defendants have acted or refused to act in ways generally applicable to the Class, thereby making appropriate final and injunctive relief or corresponding declaratory relief with regard to members of the Class as a whole. Likewise, Defendants' conduct as described above is unlawful, is capable of repetition, and will continue unless restrained and enjoined by the Court.

118.   The Class and California Sub-Class may also be certified because:

      (a) the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual members, which would establish incompatible standards of conduct for Defendants;

      (b) the prosecution of separate actions by individual members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members not

parties to the adjudications, or substantially impair or impede their ability to protect their interests; and,

(c) Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Classes as a whole.

119. At this time, this suit expressly is not intended to request any recovery for personal injury and claims related thereto.

## FIRST CAUSE OF ACTION

### VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*

### CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")

### [CALIFORNIA SUB-CLASS ONLY]

120. Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

121. Plaintiffs and Defendants are each "person[s]" as defined by California Business & Professional Code § 17201.

122. California Business & Professional Code § 17204 authorizes a private right of action on both an individual and representative basis.

123. "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs": (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising." The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

124. By and through Defendants' conduct alleged in further detail above and herein, Defendant engaged in conduct that constitutes unfair business practices prohibited by Bus. & Prof. Code § 17200 *et seq*.

125. Defendants' actions, representations or omissions constitute an "unfair" business act or practice under Business & Professions Code §17200, *et seq*. in that

Defendants' conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

126. Without limitation, it is an unfair business act or practice for Defendants to offer borrowers (including Plaintiffs) loan modification offers that it then refuses to honor, in an effort to get borrowers to agree to one or more subsequent adverse loan modification offers from Wells Fargo.

127. Such conduct by Defendants offends established public policy and/or is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers in that consumers are led to believe that in the event of a nationwide pandemic and closure of facilities, they would receive a refund for services they could no longer use.

128. Plaintiffs and member of the Classes could not have reasonably avoided the injury they suffered. Indeed, Plaintiffs diligently, and timely, returned the initial Loan Modification Offer that had been accepted by Plaintiffs and the member of the Classes, notarized, and timely received by Wells Fargo, only to have Wells Fargo refuse to honor it and still fail to honor it to date, in order for Wells Fargo to benefit economically thereby at the expense of the consumers.

129. Plaintiffs reserve the right to allege further conduct that constitutes other unfair business acts or practices. Such conduct is ongoing and continues to this date, as Defendant continues to refuse to provide Plaintiffs, and those similarly situated, with the original loan modification terms.

### SECOND CAUSE OF ACTION

### BREACH OF CONTRACT

### [NATIONWIDE CLASS AND CALIFORNIA SUB-CLASS]

130. Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

131. "To prevail on a cause of action for breach of contract, the plaintiff must

prove (1) the contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff." *Richman v. Hartley*, 224 Cal.App.4th 1182, 1186 (2014).

132. "Repudiation of a contract, also known as 'anticipatory breach,' occurs when a party announces an intention not to perform prior to the time due for performance." *Stephens & Stephens XII, LLC v. Fireman's Fund Ins. Co.*, 231 Cal.App.4th 1131, 1150 (2014).

133. Anticipatory breach can be express or implied. "An express repudiation is a clear, positive, unequivocal refusal to perform; an implied repudiation results from conduct where the promisor puts it out of his power to perform so as to make substantial performance of his promise impossible." *Taylor v. Johnston*, 15 Cal.3d 130, 137 (1975).

134. Plaintiff and each Member of the Classes entered into a written, agreement and contract with Defendants for a loan modification.

135. Performance was possible, but Defendants willfully failed to perform their obligation under the contract by refusing to process the loan modification or by knowingly failing to process the loan modification in a timely manner.

136. Plaintiffs and each Class Member performed their obligations under the contract by timely executing and returning the loan modification agreements.

137. Defendants breached its agreements with Plaintiffs and the members of the Classes because Defendants either: i) refused to honor the terms of the original Loan Modification Offer, and before time for Defendants' performance, announced an intention not to perform under the terms of the original Loan Modification Offer, despite the fact that Plaintiffs' timely returned the Loan Modification Agreement; or ii) knowingly failed to process the loan modification in a timely manner.

138. As a result, Plaintiffs' and the members of the Classes have suffered economic harm, including but not limited to lost opportunity costs and higher monthly mortgage payments.

139.   Plaintiffs and Class Members have suffered injury and damages from Defendants' breach by, without limitation, not receiving the benefit of their bargain.

140.   In every contract or agreement there is an implied promise of good faith and fair dealing which means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. Defendants violated the duty to act fairly and in good faith. Plaintiffs and the members of the Classes entered into contracts with the Defendants.

141.   Plaintiffs and the members of the Classes did all, or substantially all, of the significant things that the contract required them to do. All conditions required for Defendants' performance had occurred. Defendants did not honor Plaintiffs and the Class Members' right to receive the benefits of the contract. Plaintiffs and the members of the Classes were harmed and damaged by Defendants' conduct.

142.   Plaintiffs and the members of the Classes have been damaged as a direct and proximate result of Defendants' bad faith and Defendants' breach of the agreement as alleged herein. Including, at a minimum by Plaintiffs being required to make monthly mortgage payments that are higher than what Defendants promised in the accepted original Loan Modification Offer.

143.   Plaintiffs and the Members of the Classes request the Court enter an order for specific performance requiring Defendants to honor the terms of their accepted Loan Modification Offer. *See* Cal. Civ. Code § 3384, *et seq*.

144.   Plaintiffs and the members of the Classes are also entitled to actual damages in an amount to be determined in this proceeding. Plaintiffs and the members of the Classes request the Court enter an order awarding Plaintiffs and the Class Members actual damages, compensatory damages and restitution in the alternative to specific performance, should specific performance not be awarded.

145.   Plaintiffs and the members of the Classes therefore also seek pre-and-post judgment interest and attorneys' fees and costs as allowed by statute, including without limitation those recoverable under Cal. Code Civ. Proc. § 1021.5, any

common law "private attorney general" equitable doctrine, any "common fund" doctrine, any "substantial benefit" doctrine, and/or any equitable principles of contribution and/or other methods of awarding attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT
### [NATIONAL CLASS AND CALIFORNIA SUB-CLASS]

146.   Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

147.   Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendants.

148.   Plaintiffs bring this claim, in the alternative to the breach of contract claim, individually and on behalf of the members of the Nationwide and California Sub-Class against Defendants.

149.   "[T]he elements of unjust enrichment are: (a) receipt of a benefit; and (b) unjust retention of the benefit at the expense of another." *Valencia v. Volkswagen Grp. Of Am. Inc.,* No. 15-CV-00887-HSG, 2015 WL 4747533 at *8 (N.D. Cal. Aug. 11, 2015).  *See also, Munoz v. MacMillan*, 195 Cal. App. 4th 648, 661 (2011) ("Common law principles of restitution require a party to return a benefit when the retention of such benefit would unjustly enrich the recipient; a typical cause of action involving such remedy is 'quasi-contract.'")

150.   "When a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). "Whether termed unjust enrichment, quasi-contract, or quantum meruit, the equitable remedy of restitution when unjust enrichment has occurred "is an obligation (not a true contract [citation]) created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to her or her former position by return of the thing or its equivalent in money." *F.D.I.C. v. Dintino*, 167 Cal. App. 4th 333, 346 (2008).

151.   Plaintiffs and members of the Classes conferred non-gratuitous benefits upon Defendants by paying a higher amount on their home loan, thereby significantly increasing Defendants' revenue and profits (from among other things by benefitting from increased mortgage fees compared to if Defendants had processed the accepted original loan modification offers), thereby unjustly enriching Defendants at the expense of and to the detriment of Plaintiffs and the members of the Classes.

152.   Defendants' retention of any benefit collected from Plaintiffs' and Class Member's payments to Defendants, either directly or indirectly, violated principles of justice, equity, and good conscience. Thus, Defendants have been unjustly enriched and Plaintiffs and Class Members are entitled to recover from Defendants all amounts that Defendants have wrongfully and improperly obtained.

153.   As a result of Defendants' unlawful practices, Plaintiffs and Class Members have suffered concrete harm and injury. Plaintiffs and Class Members are therefore entitled to seek disgorgement and restitution of wrongful profits, revenue, and benefits conferred upon Defendants in a manner established by this Court.

154.   Plaintiffs and Class Members request the Court enter an order awarding Plaintiffs and the Class Members restitution, damages, and that they are entitled to recover their reasonable attorney's fees.

155.   Plaintiffs and Class Members therefore also seek pre-and-post-judgement interest and attorney's fees and costs as allowed by statute, including without limitation those recoverable under Cal. Code Civ. Proc. § 1021.5, any common law "private attorney general" equitable doctrine, any "common fund" doctrine, any "substantial benefit" doctrine, and/or any equitable principles of contribution and/or other methods of awarding attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Classes, pray for the following relief against Defendants, and each of them:

- That this action be certified as a Class Action, establishing the Class and California Sub-Class;

- Appointing Plaintiffs as the representative of the Classes;

- Appointing the law firms representing Plaintiffs as Class Counsel;

- That the Court find and declare that Defendants have violated the UCL and committed unfair, unlawful, and/or deceptive business practices;

- An order requiring Defendants to pay restitution to Plaintiffs and the Class due to Defendant's UCL violations, pursuant to Cal. Bus. & Prof. Code §§ 17200-17205 in the amount of the money paid to Defendants not refunded;

- An order requiring imposition of a constructive trust and and/or disgorgement of Defendants' ill-gotten gains and to pay restitution to Plaintiffs and all members of the Class and to restore to Plaintiffs and members of the Class all funds acquired by means of any act or practice declared by this court to be an unlawful, fraudulent, or unfair business act or practice, in violation of laws, statutes or regulations, or constituting unfair competition;

- An Order enjoining Defendants from continuing the wrongful conduct alleged herein and be required to comply with all applicable laws, including public injunctive relief;

- Specific Performance of the residential loan modifications;

- Actual damages, compensatory and all other statutory damages allowed under applicable laws;

- Punitive damages allowable by applicable laws;

- Costs of suit;

- Pre-Judgment and Post-Judgment interest;

- An award of reasonable attorneys' fees for Plaintiffs and the Class pursuant to Code of Civil Procedure § 1021.5, the private attorney general doctrine, and/or any other applicable law; and,

- Any and all other relief as this Court may deem necessary or appropriate.

### JURY DEMAND

156. Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiffs are entitled to, and demand, a trial by jury on all issue so triable.

Dated: December 6, 2021                          Respectfully submitted,

                                                 KAZEROUNI LAW GROUP, APC

                                                 By:___/s/ Abbas Kazerounian_____
                                                      ABBAS KAZEROUNIAN, ESQ.
                                                      ak@kazlg.com
                                                      ATTORNEY FOR PLAINTIFFS

CLASS ACTION COMPLAINT